IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN

DISTRICT OF TENNESSEE AT KNOXVILLE

| | |
|---|---|
| KAREN M. HODGE,<br><br>Plaintiff,<br><br>vs.<br><br>TETON TRANSPORTATION, INC., and CELADON TRUCKING SERVICES, INC.,<br><br>Defendants. | FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW<br><br><br><br>Case No. 3:09-cv-230-TC |

Plaintiff Karen Hodge brought this action against her former employer, Teton Transportation, Inc. (Teton), alleging that Teton violated the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601, *et seq.*, by discharging her for taking protected medical leave. Following a two-day bench trial on October 28-29, 2013, the court reviewed the trial transcript, the exhibits received into evidence, and the parties' proposed findings of fact and conclusions of law. For the reasons described below, the court finds that Ms. Hodge failed to establish that Teton fired her for taking protected medical leave and accordingly Teton did not violate the FMLA.

FINDINGS OF FACT

A.  **The Parties**

From June 2006 to September 2008, Ms. Hodge (now Ms. Dedrick) worked for Teton as a fleet manager. Before it closed its business in 2012, Teton was a trucking company that employed drivers to drive shipments to various locations throughout the United States. As fleet

manager, Ms. Hodge was responsible for dispatching, supervising, and monitoring the transit of the truck drivers.

A fleet manager's responsibilities included communicating with the truck drivers and giving the drivers information "of what customer they were going to, what plan was on the truck," in addition to talking to the drivers about "their hours of service, DOT rules and regulations, determine hours of service, if they had the hours to do the load they were planned on, give them directions, [and] hand out money, if they needed toll money or lumber fees." (Trial Tr. 190-91, Oct. 27-28, 2013.) The fleet manager was typically responsible for overseeing fifty drivers throughout the day. If a fleet manager was absent from work, Teton would have to either reassign her trucks to another fleet manager, or bring in an off-duty fleet manager who would then be paid overtime.

Teton had an absentee policy, which read, in pertinent part: " Unnecessary and/or frequent absences and late arrivals shift the burden of added workload to other Operations staff and causes interruptions of service to customers. Therefore, Teton Transportation, Inc. has a very simple policy about absenteeism and lateness – they are not tolerated." (Teton Policy, Def.'s Ex. D9, at 1.)

**B.     The Weekend of September 12-14**

After working her full shift on Thursday, September 11, 2008, Ms. Hodge drove from Teton's facility in Knoxville, Tennessee, to Abingdon, Virginia, to see her then-boyfriend (now husband) Earl Dedrick. On Friday morning, she drove back to Knoxville and was on time for her 8:00 a.m. shift. Knoxville, Tennessee, and Abingdon, Virginia, are approximately 123 miles apart. On Friday, September 12, after work, Ms. Hodge returned to her apartment in Kodak,

2

Tennessee, which is near Knoxville, where she spent the night.

That Saturday, Ms. Hodge drove to Draper, Virginia, to visit her mother and help her with cleaning, cooking, and other errands during the weekend.

Mr. Dedrick also drove to Ms. Hodge's mother's home where he arrived sometime around midnight Sunday or in the early morning hours of Monday, September 15. Ms. Hodge and Mr. Dedrick did not sleep and were awake all night cleaning and doing other chores in Ms. Hodge's mother's home.

**C.    Monday, September 15**

Ms. Hodge testified that she believed that she left Draper with Mr. Dedrick around 6:00 or 6:30 a.m. Monday morning, though she had to be at work in Knoxville at 8:00 a.m. Mr. Dedrick put their departure time at around 5:30 a.m. Draper and Knoxville are about 200 miles apart.[1] Ms. Hodge estimated that she would have arrived at work "between 9:00, 9:30, possibly as late as 10:00." (Tr. 70.)

While getting ready to leave, Ms. Hodge took some of her prescription medication. She was not sure which medications she took that morning. She thinks that she accidentally took Celexa, an anti-depressant, instead of her prescribed weight loss drug, Phentermine. When she left her mother's house, Ms. Hodge stated that she was experiencing chest pains, shortness of breath, headaches, and feeling generally "lousy." (Tr. 40.) She described the chest pains as "very sharp," "jabby feeling," "seven out of ten," and that she thought they were "very serious," but also stated that she "just kind of ignor[ed] them." (Tr. 40.) Ms. Hodge's medical records

---

[1]This number is based on Ms. Hodge's testimony that Draper and Abingdon are approximately 75 miles apart and that Abingdon is around 123 miles away from Knoxville.

from her hospital stay indicate that Ms. Hodge reported that the chest pains did not begin until 3:30 p.m., or "late afternoon" on Monday and that the pain was moderate, or a 5 out of 10. (Tr. 99-100; Johnston Memorial Hospital Records, Pl.'s Ex. 4, at 6.)

During their drive, Ms. Hodge continued to experience chest pains. Mr. Dedrick decided to stop in Abingdon because Ms. Hodge felt that she could just "sleep it off." Ms. Hodge testified that Mr. Dedrick wanted to take her to a hospital, but she refused. Ms. Hodge was also experiencing drowsiness. She believed her tiredness stemmed from accidentally taking Celexa that morning and not from staying up all night.

Because she was feeling "incoherent," Ms. Hodge had Mr. Dedrick call Teton to tell them that she could not go to work that day. Ms. Hodge testified: "[Mr. Dedrick] called Teton and reported to them that I probably would not be in to work because that I was drowsy and that he was having a hard time, that he was having a hard time trying to keep me awake." (Tr. 45.) Bruce Hoffman, a manager at Teton, spoke with Mr. Dedrick and told him to "keep them posted of [her] status." (Tr. 45-46.) Mr. Hoffman told Anthony Colombo, Teton's Chief Operations Officer, that Ms. Hodge would not be at work because she had taken a sleeping pill and couldn't get out of bed.

When they arrived in Abingdon, Mr. Dedrick stopped at the Days Inn Motel and reserved a room for Ms. Hodge. When asked why he didn't simply continue to Ms. Hodge's apartment in Kodak, Mr. Dedrick explained that he was concerned because of "the way that she was tossing and turning [and] complaining of pain. She wasn't awake complaining." (Tr. 155.)

Ms. Hodge testified that once in the room, she put her pajamas on and then "crash[ed] and burn[ed]." (Tr. 43.) Ms. Hodge maintains that did not wake up or get out of bed until

4

Tuesday morning. Mr. Dedrick returned to Kodak because, he testified, he needed to do laundry and to sleep. He did not return to the motel to check on Ms. Hodge until Monday evening.

Ms. Hodge was asked about Mr. Dedrick's leaving:

> Q. Isn't it a fact that he left you there all day?
> A. I can't say that. I was asleep. I can't speak for him.
> Q. Hasn't he told you that?
> A. He has told me that.
> . . .
> Q. He said he left you there and drove to Knoxville where he fell asleep?
> A. Yes, sir.
> . . .
> Q. And you supposedly had a serious health condition and he left you there all alone in the motel with chest pain and everything else? Couldn't wake you up?
> A. Like I told you before, I told him I thought I could sleep it off. I would be okay.

(Tr. 75-76.) Besides one attempt to call her, Mr. Dedrick did not call Ms. Hodge that day. He stated, "I looked at it this way. If she was [a]wake, she would call me because I wasn't there. Obviously, she was not awake. She didn't call me." (Tr. 158.)

**D. Cell Phone Calls**

Ms. Hodge testified that she did not know where her cell phone was when she checked in at the motel. Mr. Dedrick maintains that Ms. Hodge's phone was in the car on Monday when he drove to Kodak, but he did not realize that he had her phone until he tried calling her. The two phones were identical in their external appearance, but were assigned different phone numbers and contained different contacts.

Before she went to the motel on Monday, Ms. Hodge called an ex-boyfriend at 6:22 a.m. because, Ms. Hodge explained, he owed her money. He returned her call at 6:32 a.m. At 7:13 a.m., Ms. Hodge testified that Mr. Dedrick called Teton to tell them that Ms. Hodge was unable

5

to make her shift that day. Ms. Hodge maintains that these were the only phone calls she remembered making that day.

At 12:23 p.m., when, according to Ms. Hodge she was sleeping, her phone records show an incoming call from Mr. Dedrick's daughter, Krista. The phone record shows that the call lasted for approximately six minutes. At 12:29 p.m., there was a call to Ms. Hodge's voicemail box; an incoming call from Krista at 2:47 p.m.; and an outgoing call to Krista at 3:20 p.m. Ms. Hodge's phone record reflects that the outgoing call lasted for approximately 4 minutes.

At 3:39 p.m., Mr. Dedrick's phone records show a call to 411, an information number. Mr. Dedrick called 411 to get the number for the Sevier County Clerk, whom he called immediately after placing the 411 call. Ms. Hodge's phone record also shows an outgoing call to the Sevier County Clerk at 3:40 p.m.

Ms. Hodge's phone records reflect several more incoming and outgoing calls made between 5:47 p.m. and 11:26 p.m. that Ms. Hodge states she was not aware of. The lengths of the calls range from zero minutes, two minutes, three minutes, four and five minutes, ten minutes, and one forty-four minute call.

**E.     Tuesday, September 16, to Monday, September 22**

On the morning of Tuesday, September 16, Ms. Hodge said she was still experiencing chest pains. She described the chest pains as being sharp and restricting her breathing. Mr. Dedrick insisted that Ms. Hodge go to the hospital. On the way to the hospital, Mr. Dedrick called Teton and told the night dispatcher, Matt Cline, that Ms. Hodge was still experiencing chest pains and that they were on their way to the hospital. Mr. Dedrick called Teton again later that day and told Mr. Hoffman that Ms. Hodge had been admitted into the hospital.

6

Ms. Hodge was in the hospital from Tuesday morning until late in the evening on Thursday, September 18. On Wednesday, while in the hospital, Ms. Hodge called Teton and spoke to Bruce Hoffman to inform him of "still being admitted into the hospital and . . . I gave Mr. Hoffman the hospital phone number, the hospital address, the room number that I was in and even my personal code to where if anyone at Teton needed to contact me they had all the information they needed to get ahold of me while I was in the hospital." (Tr. 51-52.) On Thursday, she called Mr. Hoffman again to let him know that the hospital was performing more tests.

Ms. Hodge maintains that when she was discharged from the hospital, a "Dr. Kent" directed her to see her primary care physician before returning back to work.[2] (Tr. 50.) But the medical record reflects no such instruction; in fact, the medical record shows that Ms. Hodge was released with no restrictions for activities and no restriction on when she could return to work. (See Johnston Memorial Hospital Records, Def.'s Ex. D15, at 6.)

After being discharged, Ms. Hodge claimed that she tried to call her primary care physician to make an appointment but the physician was, Ms. Hodge contends, not available until Monday, September 22 at the earliest.

At around 11:40 a.m. on Friday morning, Ms. Virginia Hammond sent an email to Ms. Stephanie Johnson, a customer service representative, asking if she could contact Ms. Hodge to "find out if she needs to file for short-term disability or family medical leave." (Hammond/ Johnson Corr., Def.'s Ex. 6 at 1.) There is no evidence that Ms. Johnson and Ms. Hodge discussed disability leave or FMLA when they spoke later on Friday evening. Between Monday,

---

[2]Wiley Kent was a physician's assistant at the hospital, not a doctor.

7

September 15, and Monday, September 22, Ms. Hodge never asked to classify her absence as FMLA leave and Teton did not send Ms. Hodge a letter regarding FMLA leave.

Instead of going to work on Friday, Ms. Hodge testified that she "[j]ust laid around the house." (Tr. 55.) It was not until late Friday evening that she notified anyone at Teton that would miss her Friday shift. When she did contact Teton, Ms. Hodge spoke with Ms. Johnson. According to Ms. Hodge, she spoke to Ms. Johnson "so she could relay it to Mr. Colombo and he would vice versa tell her what to tell me instead of picking up the phone." (Tr. 56.) Ms. Hodge told Ms. Johnson that she would not be able to return to work until she received approval from her primary care physician. Mr. Colombo testified that Ms. Johnson told him that Ms. Hodge had said that she had "things to take care of" that day, but that she would be at work on Monday "with bells on." (Tr. 207.)

On Monday morning, Ms. Hodge called Bruce Hoffman and told him that she had tried to call her doctor's office to make an appointment, but they were not open until 8 a.m. Ms. Hodge called the doctor's office again and made an appointment for Thursday, September 25. After making the appointment, Ms. Hodge called Mr. Hoffman and, according to her testimony, "let him know that I wouldn't be in to work until at least Thursday until after I was seen by my primary care physician." (Tr. 60.) Mr. Hoffman then told Mr. Colombo that he had spoken with Ms. Hodge.

Mr. Colombo described his conversation with Mr. Hoffman:

Bruce walked into my office and said, "Karen isn't here again. She just called and said she is not coming." I said, "okay, and why?" He said, "I didn't ask. I just assume since she didn't show up Friday and hasn't shown up today that she is just not coming to work." I said, "no, you can't assume that. You can't assume somebody quit. You should have asked her." He said, "well, I didn't." I said,

"I'll call her."

(Tr. 207.)

After speaking with Mr. Hoffman, Mr. Colombo called Ms. Hodge. Ms. Hodges' and Mr. Colombo's descriptions of their conversation differ significantly. According to Ms. Hodge, Mr. Colombo asked her what was happening and she told him that she "could not come back to work until I was able to be cleared by my primary care physician." (Tr. 61.) She testified:

> [Mr. Colombo] was like, "but why were you in Virginia?" I said, "Tony, I went to Virginia last weekend to help my parents." "But you ended up in the hospital in Virginia. Why were you in the hospital in Virginia?" I said, "obviously, there was a medical situation at hand." Then he goes, "well, don't worry about stressing your ass off . . . to come to work, because you are no longer needed."
>
> I said, "you are going to fire me over this?" He says, "yeah." I said, "are you serious?" He is like, "I have no more, nothing else to say." I said, "so you are firing me over being admitted into the hospital?" He was like, "yeah."

(Tr. 61-62.)

At trial, Ms. Hodge admitted that she had not testified in her deposition about Mr. Colombo's alleged statements that he was firing her for being admitted into the hospital. Mr. Colombo testified that Ms. Hodge never asked him if her hospital stay was a reason for firing her and she never told him that she couldn't return to work until she had seen her primary physician.

Mr. Colombo testified that when he spoke with Ms. Hodge on Monday, September 22, she told him that she had a medical release to come back to work but that she had decided not to return for personal reasons. He gave his version of his conversation with Ms. Hodge:

> Mr. Colombo: I called her. . . . I said, "Karen, what's going on?" She said, "what do you mean?" I said, "well, you are not at work. You are supposed to be at work today. You weren't at work Friday. You didn't call. Why aren't you at work?" She said, "I don't want to work." . . .

9

> Mr. Colombo: I said, "were you released to come back to work?" She said, "yes." I said, "then why did you not come back to work Friday? Why did you not even bother calling?" She said, "I talked to Stephanie and I told Stephanie if you wanted to talk to me, you could call me." I said, "I don't need to call you. You should have been to work Friday, if you were released to come [] Friday. You definitely should be here today."
>
> Mr. Colombo: [I said,] "You not be wanting to come to work is not a valid reason to not come to work." . . .
>
> Mr. Colombo: . . . At some point I said, "listen, if you have a release to return to work slip for today" -- she says, "I do." I said, "it is without restriction?" She said, "yes." I said, "you need to come in, come back to work unless – I asked you first off why you are at home. You didn't say you are sick. Are you sick? Is there a medical reason?" She said, "no. I have personal reasons."
>
> Mr. Colombo: She said, ". . . What if I go to my doctor and get a release to come back on that day?" I said, "that doesn't matter, you have got a release to come back to work. You have to have a medical or reasonable reason not to come to work today. . . . You need to come to work today. . . ."
>
> Mr. Colombo: [The conversation] ended when she said, "are you saying that you are going to terminate me?" I said, "Karen, I know it's eight o'clock in the morning. I don't know if you are ready for work or not. Basically, you got until two o'clock. You need to be at work sometime today before two, or I am going to terminate your employment at this company." She said, "well, okay" and hung up.

(Tr. 207-10.) Ms. Hodge called Mr. Colombo back and said, "I want to clarify this, that you are actually, if I don't come to work today you are going to terminate my employment." (Tr. 211.)

Mr. Colombo testified:

> Mr. Colombo: She said, "I told you I will go and get my doctor to give me" -- I said, "no, if you go and see your doctor and get something that says there's something medically wrong with you for you not being at work today, that's a valid reason. If you have an appointment to go see your doctor and can't come in, that is a valid reason. Saying I am going to call my doctor sometime later in the week and get a

10

>>return-to-work slip, you already have a return-to-work slip. What difference would that make?" She said, "it wouldn't." I said, "you are right, it wouldn't."

Mr. Colombo: [I said,] "The point is you need to come to work." She said, "well, I haven't made up my mind if I am ever coming to work, but I have made up my mind I am not coming to work today."

(Tr. 211.) At the end of this conversation, Mr. Colombo terminated Ms. Hodge. (Tr. 211.)

Mr. Colombo said there were two incidents leading up to the week of September 15, 2008, that led him to believe that Ms. Hodge would soon no longer be working for Teton. She had sent a PeopleNet message to one of her drivers that stated she may or may not see them again because she was "struggling with whether she was going to come back or not." (Tr. 214.) A week after she sent the message, Ms. Hodge also had an incident on the floor of Teton where, according to Mr. Colombo, "she kind of exploded." (Tr. 216.) Mr. Colombo witnessed Ms. Hodge slam her phone down and exclaimed, "I would rather be any f'ing place than Teton Transportation right now." (Tr. 216.) Ms. Hodge admits that she did get upset, but maintains that she acted professionally and not as Mr. Colombo described.

According to Mr. Colombo, Ms. Hodge was not terminated for being in the hospital or for taking FMLA leave, but rather she was terminated for violating the absenteeism policy of Teton and for not coming back to work after her leave was over without having a valid reason. Mr. Colombo also maintained that he believed Ms. Hodge misled Teton as to her whereabouts and her reasons for her absences because her story changed two or three times.

The court finds that Mr. Colombo's testimony was more credible than Ms. Hodge's. The credible evidence shows that during the conversation between Mr. Colombo and Ms. Hodge, he did not tell her he was firing her for being in the hospital. If he had made such a statement, the

11

court does not find it believable that Ms. Hodge would have failed to mention that in her deposition testimony. Also, the credible evidence convinces the court that Ms. Hodge knew that she was free to return to work before seeing her primary care physician: her medical records made that fact clear. She simply decided, for personal reasons, that she would not go to work after being released from the hospital.

Moreover, Ms. Hodge did not call Teton on Friday, September 19, 2008, until after her shift, a violation of Teton's attendance policy. This violation of Teton's attendance policy is further evidence that Ms. Hodge was unhappy with her job at Teton and, at that time, had little interest in following Teton's absenteeism policy. The court concludes that Ms. Hodge's employment was terminated because of her violations of the absenteeism policy and not because of her stay in the hospital or any alleged medical condition or any alleged exercise of Ms. Hodge's rights under the FMLA.

CONCLUSIONS OF LAW

This court has original jurisdiction over this lawsuit under 28 U.S.C. § 1331. This cause of action was filed under the Family Medical Leave Act, codified at 29 U.S.C. § 2601, *et seq*.

As a plaintiff claiming a violation under the FMLA, Ms. Hodge was required to prove by a preponderance of the evidence that Teton violated Ms. Hodge's rights under the FMLA when it terminated her in retaliation for taking FMLA leave. She has not met this burden.

Under the FMLA, an eligible employee is entitled to twelve workweeks of leave over any period of twelve months because of a serious health condition that makes the employee unable to perform the requirements of her job. 29 U.S.C. § 2612(a)(1)(D). It is undisputed that Ms. Hodge was an eligible employee. But Ms. Hodge has failed to show that she had a serious health

12

condition that prevented her from going to work or that her employment was terminated for exercising any right under the FMLA. Ms. Hodge's employment was terminated because she violated Teton's absenteeism policy. Because Teton did not violate the FMLA, Celadon Trucking Services, Inc., cannot be liable for any alleged violation of the FMLA. Accordingly, Plaintiff's Motion for Relief from Judgment (Docket No. 215) is DENIED as moot.

ORDER

Plaintiff Karen Hodge's action and all claims against Defendants Teton Transportation, Inc., and Celadon Truck Services, Inc., are dismissed with prejudice.

SO ORDERED this 26th day of June, 2014.

BY THE COURT:

_____
TENA CAMPBELL
United States District Judge

13